816 P.2d 479

**Cary M. TAYLOR and Taylor Resources Corporation, a New Mexico corporation, Plaintiffs–Appellants,**

v.

**James D. ALLEGRETTO, Defendant–Appellee.**

No. 19112.

Supreme Court of New Mexico.

July 29, 1991.

Mary E. Lebeck, Albuquerque, for plaintiffs-appellants.

Winchester & Associates, Michael L. Winchester, Las Cruces, for defendant-appellee.

## OPINION

MONTGOMERY, Justice.

Plaintiffs seek review of the trial court's interpretation of a written contract between the parties and its rejection of their tender of parol evidence regarding alleged agreements collateral to the contract. Finding error in the court's rulings, we reverse.

### I.

Defendant Allegretto entered into a contract with plaintiff Taylor, a licensed architect and contractor and owner of plaintiff Taylor Resources Corp., a construction company, to prepare plans and specifications for a three-unit medical office building in Las Cruces, New Mexico. (Taylor and his corporation are referred to collectively in this opinion as "Taylor.") The parties met frequently during preparation of the plans and discussed the possibility of building a second three-unit complex on adjacent property also owned by Allegretto. It apparently was agreed during this time that in the initial phase of construction the shell of the first three-unit building, referred to as the 1240 Telshor property, would be constructed and that the interior of one of the units, Unit 2, would be completely finished. Allegretto would use Unit 2 as the office for his dental practice and as a model unit to show prospective buyers of the other units.

Almost one year after the parties entered into the contract for preparation of the plans for the first building, the parties agreed to execute a second contract, using a standard American Institute of Archi-

tects Abbreviated Form Agreement ("AIA agreement"), for construction of "Unit # 2—As per plans and specifications." The contract sum was listed as $126,000. The form was prepared and signed by Taylor and sent to Allegretto.

Taylor began construction on the 1240 Telshor building in September 1985. By January 1986, he had built the shell for the entire building and had completed the interior of Unit 2. In addition, he had performed work which was not included in the plans and specifications. These items included, among other things, an 80–square–foot loft, plumbing and electrical additions, built-in furniture and other fixtures, work on common areas, and site work on the adjacent lot.

For tax reasons, Allegretto moved into Unit 2 at the end of 1985, before construction was completed. Following completion of the work in January 1986, Allegretto sold Units 1 and 3 to third parties as unfinished units and sold the adjacent lot as vacant land.

Taylor maintains that he and Allegretto had entered into an oral joint-venture agreement, in which Allegretto guaranteed that Taylor would be the exclusive contractor for completion of Units 1 and 3 and construction of the second office complex. Asserting that Allegretto's sale of Units 1 and 3 as unfinished units and his sale of the adjacent lot as vacant land violated this agreement, Taylor filed suit in district court in November 1986, alleging breach of the agreement and stating claims based on quantum meruit, constructive fraud, and misrepresentation. Taylor also alleged that other agreements relating to the work to be performed and the compensation therefor governed the parties' relationship, rather than the AIA agreement, which Taylor argued was executed solely to obtain financing. Additionally, Taylor sought recovery for extra work which he alleged the parties had agreed to during construction but for which he had not been paid.

The trial court ruled against Taylor on all counts. The court found that the AIA agreement and the contract for preparation of plans were the only agreements between the parties and refused to consider evidence tendered by Taylor about the alleged oral agreements. The court also found that Allegretto had paid for the added cost of changes or additions which he had asked Taylor to perform.

Taylor abandoned his claims based on fraud and misrepresentation. On appeal, he maintains initially that the trial court erred in giving effect to the AIA agreement, asserting that the contract was prepared solely for the purpose of enabling Allegretto to obtain a loan, and that there was thus no mutual assent that the contract would govern the parties' relations. Rather, Taylor contends, the parties' relationship was governed by a series of oral agreements. He claims that he agreed to draft the plans and specifications at a fraction of his usual cost based upon Allegretto's assurances that, if he prepared satisfactory plans and the two worked well together, he would be the exclusive contractor for both building projects. Taylor maintains that Allegretto informed him that he had available $130,000 to begin the initial phase of construction and that they both agreed that Allegretto would pay Taylor this sum as a "start-up" figure, not tied to any specific amount of work. Taylor agreed to this, he says, based on Allegretto's assurances that his profit would come at the "back end of the deal" as the exclusive contractor for the building and from a portion of the profit from the sale of all units. Allegretto denies all of these alleged agreements.

In the alternative, Taylor argues that if the contract is found operative, by its own terms it covered only the construction of "Unit # 2"—the completed dental office unit—and not construction of the building shell. It also omitted any agreements about profits for work on the project as a whole at the "back end of the deal." Taylor also asserts that during construction the parties entered into numerous agreements regarding extra work not contemplated in the contract plans and that he has not been compensated for this work.

Allegretto disputes each of Taylor's contentions, maintaining that the AIA agree-

ment was the sole operative contract between the parties and that it covered all construction performed on the project, including the shell of the 1240 Telshor building and completion of the interior of Unit 2. There were no additional oral agreements between the parties, according to Allegretto, except for certain extra work for which he insists Taylor has been paid.

At trial, the court permitted Taylor to introduce testimony regarding the alleged oral agreements as outlined above, subject to the condition that at the end of the trial the court would accept or reject the testimony depending upon whether the evidence demonstrated that the oral agreements were collateral to, or instead merged into, the AIA agreement. Allegretto entered a continuing objection to the introduction of the testimony. The court concluded in separate conclusions of law that there was "no evidence of a previous stipulation or agreement between the parties that is collateral to the written contracts of the parties" and that Taylor's evidence of an alleged parol agreement was not "clear, positive and above suspicion." The court ruled that the parol evidence was therefore inadmissible. The court thus implicitly found the parties intended the AIA agreement to be operative and specifically found it covered construction of the shell of the entire building as well as the interior of Unit 2. The court also found that Allegretto had paid for the extra cost of changes or additions which he had asked Taylor to perform.

## II.

As noted, one of Taylor's principal contentions at trial was that the AIA agreement was executed solely to facilitate obtaining a loan and was not intended to govern the parties' legal relationship with respect to the building project. In support of this contention, Taylor sought to introduce evidence of the parties' understanding regarding the AIA agreement and of oral agreements which he asserted governed the parties' relationship rather than the contract. By ruling that this parol evidence was inadmissible, however, the trial court refused to consider Taylor's evidence

on this issue. We believe this ruling was in error.

It is a well-settled exception to the parol evidence rule that parol evidence is admissible to prove that a contract was executed as a sham. 3 A. Corbin, *Corbin on Contacts* § 577 (1960); *see Drink, Inc. v. Martinez,* 89 N.M. 662, 664, 556 P.2d 348, 350 (1976) ("parol evidence may always be introduced to establish that the document is not the true agreement of the parties"). The parol evidence rule requires exclusion only of evidence which contradicts or changes the terms of a document intended as a complete integration of the parties' agreement on a particular subject. *See Drink,* 89 N.M. at 664, 556 P.2d at 350. And, "if the testimony is true[,] there was no written integration of an actual agreement" that may be contradicted. 3 A. Corbin, *supra,* § 577, at 394. Certainly, the existence of the written document itself, while it may be strongly probative that a binding agreement was intended, is not alone sufficient to prove that the parties intended the writing to govern their relations. *Id.* § 577, at 386; *see also id.* § 573, at 359–60; 9 J. Wigmore, *Evidence* § 2400(5) (Chadbourn rev. ed. 1981). The court's exclusion of testimony regarding a parol agreement was therefore in error.

We note that among the trial court's rulings on this issue was its conclusion that the offer of proof regarding the parol agreement had to be denied because the evidence of such an agreement was not "clear, positive, and above suspicion." This conclusion is intertwined with the court's conclusion that there was insufficient evidence to justify rescinding any contract between the parties. Although we will assume for present purposes, without deciding, that proof which is "clear, positive, and above suspicion" may be required to justify rescission of a contract, we are not aware of any authority which permits conditioning the admissibility of parol evidence on whether the evidence carries sufficient weight to "prove" the existence of the oral agreement. *See* 1 J. Wigmore, *Evidence* § 12 (Tillers rev. ed. 1983) (rules of admissibility can have nothing to do with

the inquiry of whether certain evidence effects complete proof). The evidence was admissible.

Of course, to conclude that the evidence must be admitted

> is not to say that the ... testimony must be believed. Without doubt, the form of the instrument tends to corroborate the [party relying on the document]. Surrounding circumstances and the conduct of the parties should be given due consideration. ... But the court should not dodge the determination of the weight of the evidence by appealing to a "parol evidence rule" and finding that a written integration exists without listening to testimony that it does not.

3 A. Corbin, *supra*, § 577, at 396–400.

Here, the trial court did initially "listen to" Taylor's testimony regarding the sham issue and oral agreements, which allegedly governed the parties' relations. However, the court's rulings on parol evidence indicate that it refused to consider that evidence in arriving at its judgment. The trial court's finding that the AIA agreement was an operative contract between the parties was therefore made without benefit of the parol testimony. In light of the evidence presented by defendant which could support the conclusion that the agreement was not intended to govern the parties' relations,[1] we cannot say that the court's error was harmless, as contemplated by SCRA 1986, 1–061.

### III.

■ Even if we assume that the trial court properly found that the AIA agreement represented an effective contract between the parties, we believe the court erroneously interpreted the contract and are therefore still constrained to reverse. The trial court found that the AIA agreement was for construction of the shell of the three-unit medical complex and for completion of the interior of Unit 2. A plain reading of the document, however,

reveals that it did not include construction of the building shell, but rather related only to construction of Unit 2. The project listed on the cover page is not merely "1240 Telshor," but specifically "1240 Telshor # 2." Most importantly, the first article of the contract, entitled "The Work," describes the work which the contractor is obligated to perform as: "Unit # 2—As per plans and specifications."

Allegretto maintains that despite these specific descriptions of the subject matter of the contract, the contract incorporated construction of the shell within its scope by its reference to the plans and specifications. Allegretto points to Article 7.1 of the contract, which states that anything required by the "Contract Documents"—which include the agreement as well as the plans and specifications—is binding as if required in the agreement itself, and notes that the plans for Unit 2 included the shell. Additionally, he points to language in the same section stating, "Work not covered in the Contract Documents will not be required unless it is consistent therewith and reasonably inferable therefrom as being necessary to produce the intended results." He notes that construction of the shell was in fact necessary for completion of Unit 2.

We are not persuaded, however, that these provisions incorporated work other than construction of Unit 2. We cannot agree that simply because other work was included in the plans, it was necessarily required by the contract. We note that the plans also included completion of the interiors of Units 1 and 3, and it cannot reasonably be maintained that, simply because the original plans showed completion of the building as a whole, Taylor thereby became obligated to complete the interiors of the other units as well. The clause making all contract documents complementary can only be reasonably read to require that the documents complement each other insofar as they are consistent. Where the language of the agreement—particularly

---

**1.** Taylor introduced evidence that, although the contract price was $126,000, he was actually paid $130,000, the amount of his alleged oral agreement with Allegretto; that the parties did not abide by the terms of the contract; that the contract was not signed by Allegretto; and that the contract was solely for the purpose of obtaining financing.

typed-in language on a printed form contract—specifically indicates that the parties intended to limit the scope of the work to be performed, it simply is not "consistent" to expand the agreement because the plans as originally drawn included additional work.

Nor is it sufficient to say that completion of the shell was required because it was "necessary" for completion of Unit 2. The evident intent of the clause contemplating performance of necessary work not included in the contract documents is to include within the contract the performance of minor tasks which, although not specifically described in the plans, are nevertheless necessary to fully accomplish the work envisioned by the contract. To interpret the clause as requiring the performance of work so fundamental as construction of the shell of an entire building in a contract calling only for construction of a unit within the building is not reasonable. *See Smith v. Tinley*, 100 N.M. 663, 665, 674 P.2d 1123, 1125 (1984) (law favors reasonable interpretation of contract). Moreover, the clause specifically requires that the additional work be not only "necessary" but also "consistent" with the contract documents. For the reasons noted in the paragraph above, to require construction of the shell is not consistent with the specific limitation typed into the agreement.

In support of the trial court's interpretation of the contract, Allegretto points to the court's finding that Taylor treated the AIA agreement as a "fixed price" contract. However, this finding says nothing about whether construction of the shell was included within the price fixed in the contract. Allegretto also relies on the "entire agreement" clause in the contract, providing that the Contract Documents constitute the entire agreement between the parties.

However, the Contract Documents, listed in Article 7 of the contract, all relate to performance of "the Work," as defined in Article 1. In other words, the contract constitutes the parties' entire agreement *with respect to the subject thereof.* As we have seen, the subject of the contract, as defined in Article 1, was construction of Unit 2.

For these reasons, the trial court's finding that the agreement covered construction of the entire building shell as well as the interior of Unit 2 was in error.[2]

■ The court's error in interpreting the contract affected its ruling excluding parol evidence of agreements collateral to the contract. Apparently believing the AIA agreement (plus the initial contract for preparation of the plans) to be the complete integration of all the parties' agreements relating to the project, the court concluded that there was "no evidence of a previous stipulation or agreement between the parties that is collateral to the written contracts...." However, since the contract only covered work on Unit 2, any evidence regarding agreements about other work on the site was necessarily collateral. This would include testimony about any agreements with respect to construction of the shell and any work performed by Taylor other than on Unit 2; about whether the contract price merely represented a "start-up" figure, to be followed by other payments for work not included in the contract; and about Allegretto's alleged assurances that Taylor would make his profit from unit sales and as the exclusive contractor on the other building and units. As the court's conclusion above appears to recognize, parol evidence is admissible to prove the existence of agreements collateral to a written document. *National Old Line Ins. Co. v. Brown*, 107 N.M. 482, 487, 760 P.2d 775, 780 (1988).

2. In support of the trial court's findings, Allegretto also asserts that another contractor, Ostler, submitted a bid for a "very similar building" for $109,000—well under the contract sum or the price for which Taylor alleges he agreed orally to begin the work. However, this "bid" was in no way comparable to Taylor's and therefore does not support the trial court's findings. While Allegretto was a licensed contractor with a Certificate of Completion in Medical and Dental Facilities Design from the Harvard University School of Architecture, Ostler was not even a licensed contractor at the time of the "bid"; indeed, Ostler never submitted a formal written bid on the project, but merely "worked out some numbers" with Allegretto. Most importantly, Ostler's plans, although they did include a parking garage and a small elevator not included in Taylor's plans, did not involve completion of the interior of any of the units.

Again, admission of the parol evidence does not necessarily mean that Taylor's version of the facts must be accepted. However, even if Taylor does not adequately prove the existence of any of the alleged oral agreements when his parol evidence is considered, we believe he has raised sufficient evidence to require the court to examine his claim to recovery under the theory of quantum meruit for work performed which was not covered by any specific agreement, written or otherwise, and for which he has not been paid.

The trial court found that Allegretto paid for the added costs of any changes or additions which he requested Taylor to make and for which he was specifically billed. We see no basis for reversing this finding as unsupported by substantial evidence. The court should examine, however, the extent, if any, to which Taylor may be entitled to recover in quantum meruit for any work which was not specifically requested by Allegretto or billed by Taylor, but which may have been performed with a reasonable expectation of compensation. *See, e.g., Hydro Conduit Corp. v. Kemble,* 110 N.M. 173, 793 P.2d 855 (1990); *Flower v. Willey,* 95 N.M. 476, 623 P.2d 990 (1981); *Herbert v. Stevens,* 42 N.M. 567, 82 P. 2d 900 (1938).

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

IT IS SO ORDERED.

SOSA, C.J., and FRANCHINI, J., concur.